IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JESSICA N. FRY**
3026 Stillmeadow Drive
Collegeville, PA 19426

                 Plaintiff,

      *v.*

**AUDACY, INC. F/K/A**
**ENTERCOM COMMUNICATIONS CORP.**
2400 Market Street, 4th Fl
Philadelphia, PA 19103

                 Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

NO. **2:21-CV-04671**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Jessica N. Fry, by and through her undersigned counsel, brings this action against Defendant, Entercom Communications Corp., because of its unlawful discrimination in refusing to provide her with fair and/or equal pay, and by retaliating against her by terminating her employment for complaining about Defendant's unlawful discrimination. The discrimination and retaliation that the Defendant engaged in was based upon Ms. Fry's gender. The Defendant's conduct is in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the Pennsylvania Human Relations Act ("PHRA"), and Section 9-1103(A)(1) of the Philadelphia Code, and the Equal Pay Act of 1963.

## JURISDICTION AND VENUE

1.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq

("PHRA"), and the Philadelphia Fair Practices Ordinance, Chapter 9-1100, et seq. of the Philadelphia Code and the Equal Pay Act of 1963.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1343(e) and 42 U.S.C. §2000(e)-(f), and the principles of supplemental jurisdiction under 28 U.S.C. §1367.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), as the events giving rise to the claims occurred in this district, and the defendant may be found in this district.

4.      This Court has subject matter jurisdiction as Plaintiff has exhausted her administrative remedies and received a Right to Sue from the Equal Employment Opportunity Commission (attached as **Exhibit "A."**)

### PARTIES

5.      Plaintiff, Jessica N. Fry ("Ms. Fry" or "Plaintiff"), is an adult individual and a citizen of the United States who resides at 3026 Stillmeadow Drive, Collegeville, PA 19426.

6.      Defendant, Audacy, Inc. f/k/a Entercom Communications Corp. ("Entercom" or "Defendant") is a Pennsylvania corporation with a principal place of business at 2400 Market Street, 4th Fl Philadelphia, PA 19103.

7.      Entercom has been, at all relevant times, an employer as defined by 42 U.S.C. § 2000e(b), 43 P.S. § 954, and Phila. Code § 9-1102(1)(h).

### FACTS

8.      Ms. Fry has been in radio for over fifteen years.

9.      Ms. Fry's experience includes a B.A. in Broadcasting, Telecommunications and Mass Media from Temple University, one of the top Broadcasting Programs in the United States.

10.     Ms. Fry graduated in 2006, after completing her degree in just three years.

11.     Ms. Fry began her radio career full-time while still attending Temple University as a solo Overnight Host on WRDW-FM Philadelphia and shortly thereafter as the Morning Show Co-Host of "Chio In The Morning."

12.     Not only did her on-air and extensive production efforts contribute to exceptional ratings, but also earned awards such as "Best Local CHR Morning Show 2006" and, nationally, "Best Morning Show Segment."

13.     Following that year, Ms. Fry was promoted to another solo Host position, this time in the Midday time slot on WRDW, where she met and exceeded ratings goals and remained a vital, branded personality for nine years.

14.     Moreover, Ms. Fry served as Music Director for WRDW's HD2 station, produced station imaging for WRDW, and in 2008 was awarded "Best Midday Personality Philadelphia" by The March of Dimes.

15.     In August of 2014, Ms. Fry was contacted and hired by the Program Director of 95.5 PLJ in New York City, one of the most legendary Hot Adult Contemporary stations in the United States and in the prestigious number one market.

16.     She hosted solo weekend shows, weekday overnight shows and swing shifts. While doing so, she was recruited by iHeartMedia (a national media conglomerate) to be the sole Afternoon Drive Host on yet another heritage station in her hometown of Philadelphia, WIOQ-FM Q102.

17.     Ms. Fry served as Afternoon Drive Host and Music Director for WIOQ for over three years. She exceeded ratings goals, was bonused for seven consecutive quarters and was instrumental in the closing and retainment of countless local and national advertising clients. Consistently, Ms. Fry was chosen to represent clients in on-air endorsements and on-site appearances as a result of delivering exceptional service and even campaign recommendations to ensure repeat business. Ms.

Fry was one of the top endorsement talents in the entire iHeartMedia Philadelphia cluster if not the top producing talent, depending on the quarter. As for Ms. Fry's Music Director experience, her meticulous programming logs were commended by iHeartMedia managers and format captains and used as an example nationwide of how to best schedule CHR music.

18.     Ms. Fry's experience has largely been in the Philadelphia region.

19.     Accordingly, Ms. Fry's stage name has gained significant notoriety in the Philadelphia region.

20.     During this time, Ms. Fry used the stage name "Casey Reed," which was the name both sponsors and the public associated with Ms. Fry due to her regional fame and prestige.

21.     Ms. Fry's experience includes, but is not limited to:

     i.      Solo hosting shows;[1]

     ii.     Co-hosting shows;

     iii.    Running the operating board

     iv.     Creating and/or writing show content;

     v.      Maintaining music logs;

     vi.     Managing music format and programming;

     vii.    Audio production;

     viii.   Caller screening and editing;

     ix.     Show programming;

     x.      Leading and closing on-air time;

     xi.     Conducting research;

---

[1] Ms. Fry had over fifteen years of experience as a solo host on a major afternoon show. Morning shows and afteroon shows coincide with standard rush hour commutes, reach comparable markets, and serve as the historically most lucrative shows with the largest audiences.

xii.    Drafting copy-writing;

xiii.    Creating digital and web content;

xiv.    Post-Show production;

xv.    Attending network meetings;

xvi.    Managing advertising campaigns;

xvii.    Obtaining sponsorships, clients and advertisers; and

xviii.    Maintaining positive relationships with clients and advertisers.

22.    Not only did Ms. Fry's 15-year on-air career focus on radio station programming and production experience, but her work outside the radio stations involved running her own LLC— Small Fry LLC, d/b/a Limelight Media Studios ("Limelight").

23.    Limelight provided "entertainment hosting and audio/video production" services and involved Ms. Fry independently producing audio, voiceovers, commercials, soundscapes and e-learning production for major local and national brands, including Fortune 500 companies.

24.    Entercom was aware of the above-listed experience and skills at all times while considering employment of Ms. Fry for the TDY station.

25.    Ms. Fry began negotiations with Entercom to become a host of a new morning show— to eventually be titled the "Coop and Casey Show"—in June, 2018.

26.    When negotiating her employment with Entercom for the TDY station, Ms. Fry explicitly stated that she did not want to be a "co-host."

27.    In the radio industry, a "co-host" has a distinct meaning—it carries less weight than a "host."

28.     Accordingly, Ms. Fry expressly requested and was expressly assured by Entercom that she was a "Host," **not** a cohost, of the Coop and Casey Show.[2]

29.     The other host of the show was slated to be Sean Tabler, a male, who went by the stage name "Coop."

30.     Based on these representations and promises, Ms. Fry signed an Employment Agreement for the TDY station for the term of November 5, 2018 through November 4, 2020. See Employment Agreement attached as "**Exhibit B.**"

**Ms. Fry Contributes Equally, if Not More, than Mr. Tabler to the "Coop and Casey Show"**

31.     Ms. Fry was equally responsible for any and all duties on "Coop and Casey."

32.     Ms. Fry was also at least an equal part of the show's success, if not its driving force.

33.     Ms. Fry performed Audio Production duties in the same capacity as Mr. Tabler.

34.     Ms. Fry solely selected daily show audio to be aired each morning as well as edited it on the same program that listener calls were edited on.

35.     In fact, Ms. Fry had over 15 years of experience using the editing software program "VoxPro" and taught Mr. Tabler how to edit more quickly and efficiently using various functions within the program that he was previously unaware of.

36.     Within a few weeks of working together on air, Ms. Fry and Mr. Tabler had the program installed on one of the three computers Ms. Fry utilized so that she could assist in editing show audio and listener calls, as well as daily commercial production.

37.     During live programming, Ms. Fry and Mr. Tabler would take turns editing calls depending on who was working on another task.

---

[2] In laymen's terms Ms. Fry was referred to on-air, in laymen's terms, as a co-host, but this carries a different meaning than her job title with TDY.

38.     In many instances, Ms. Fry would aide Mr. Tabler in editing calls as she was able to do so more rapidly with just seconds of edit time available before it needed to be aired live.

39.     Entercom also used Adobe Audition software program for editing on-air content.

40.     Ms. Fry has used this program for over fifteen years prior to the Coop and Casey Show.

41.     In fact, she used it to produce bits and various audio imaging for "Coop and Casey," including the show's opening imaging.

42.     Her editing also included commercial production for endorsements, airing and gathering show sound effects and audio beds.

43.     Mr. Fry also wrote daily show promotional copy, topics and segments and she and Mr. Tabler co-authored contesting, promotional and imaging copy.

44.     The above-listed duties accounted for at least 50% of team duties, if not more— while Mr. Tabler's primary on-air responsibility was to run the "operating board."

45.     Ms. Fry offered several times at the one-year mark of their two-year contacts to switch positions at the operating board with Mr. Tabler.

46.     She proposed that she would run the board, like she did for over a decade prior, and Mr. Tabler would take on her tasks.

47.     Ms. Fry made this proposition to Mr. Tabler as well as Entercom and was ultimately denied.

48.     Ms. Fry and Mr. Tabler earned all TDY ratings and accolades together, none more-so than the other.

49.     As a team they accomplished goals never before seen on the frequency as evidenced by emails of congratulations to "Coop and Casey" and/or "Mornings."

50.     Furthermore, Ms. Fry and Mr. Tabler collectively won the Pennsylvania Association of Broadcasters "Outstanding Morning Personality/Team 2019" award in Q1 2020, just weeks before her termination.

### Ms. Fry Had Significantly More Relevant Experience and Qualifications than Mr. Tabler, Along with Equal Job Responsibilities

51.     Ms. Fry was at least as experienced as Mr. Tabler and more valuable to the TDY network in many ways.

52.     Not only did she have more experience as a solo host, but Ms. Fry's stage name (Casey Reed) was already well-known in the Philadelphia region from over fifteen years of on-air experience as solo host of a competing afternoon show.

53.     Ms. Fry had previously garnered listenership for nine years on the TDY frequency "96.5" when it was the station WRDW. Notably, Mr. Tabler's relevant experience was in an entirely different region and carried no name recognition in the Philadelphia market.

54.     Ms. Fry brought name recognition, existing clients, and regional notoriety to TDY's morning show that Mr. Tabler did not.

55.     Ms. Fry also had more experience with TDY music logs, format, artists and programming than Mr. Tabler, and was at least as well-versed if not more so in show programming ideas, topic selection and execution.

56.     Ms. Fry and Mr. Tabler often arrived at the station at 4am together or within minutes of one another. They also left the station together when their collaborative post-show production was complete, the only exception being when Mr. Tabler stayed to utilize Entercom's equipment to record his separate country show for another company.

57.     Ms. Fry and Mr. Tabler attended every meeting regarding their show together.

### Unequal Pay and Payment Opportunities

### i.      Salary

58.      Despite Ms. Fry's experience, which was at least equal to if not greater than Mr. Tabler's, she made at least $35,000 less than Mr. Tabler.

59.      Despite her pre-employment negotiations for a higher salary, Entercom advised that its final salary offer was $115,000.

60.      Mr. Tabler noted, however, that his salary was $150,000.

### ii.      Paid Appearances and Endorsements (Additional Income Opportunities)

61.      Several months after Ms. Fry was hired, she noticed that she was being passed over for many on-site, paid client appearances.

62.      Not only was Ms. Fry being passed over, but she was continuously asked to host and attend charity events on behalf of Entercom, free of charge.

63.      Although on-air talent is occasionally asked to participate in community outreach, the frequency was unlike what Ms. Fry had experienced in her lengthy radio career.

64.      In one instance, she received an email requesting her to host a free appearance as she was already wrapping up another pro bono appearance.

65.      Mr. Tabler was not asked at the same volume as Ms. Fry to perform similar, unpaid work.

66.      It was at this time and due to this influx that Ms. Fry asked to speak with her supervisor, Ms. Shelly Easton.

67.      Ms. Fry expressed her concerns to Ms. Easton and indicated she was unable to do any additional free events at that time, however, would be available for one charity event of Entercom's choosing per quarter.

68.     Ms. Easton agreed the proposal was fair and acknowledged the ratio of free events to paid events Ms. Fry specifically had been requested to do was "unfair."

69.     Male employees receieved significantly more paid appearances and endorsements than Ms. Fry, despite her seniority and day part.

70.     Ms. Fry asked Ms. Easton why less seasoned employees such as afternoon host Michael Bennett "Bennett" and novice night host Michael Levy "LA" were given more paid opportunities in general.

71.     Ms. Easton replied, "We have to make up for their salaries."

72.     This is a direct contradiction to Entercom's claim of a rotation schedule for delegating paid appearances and endorsements.

73.     In another instance in 2019, Mr. Tabler told Ms. Fry that he was going to Ms. Easton to request additional paid opportunities.

74.     Mr. Tabler was assured by Entercom that he would be receiving more paid opportunities, and shortly thereafter, he began receiving those opportunities.

75.     Entercom frequently gave out endorsements by asking on-air hosts if they had any connection to, interest in or experience with potential advertisements, and hosts were given the chance to request the opportunity.

76.     Ms. Fry also brought up the disparity in endorsement opportunities when Mr. Tabler was given an endorsement for a television series in which he did not watch, yet Ms. Fry did. Ms. Fry provided series context and assisted Mr. Tabler with the endorsement and Ms. Fry enquired why she had not heard of the opportunity.

77.     Moreover, Entercom asked Ms. Fry and Ms. Andrea Duffy (the only other terminated on-air host and a female) to perform an identical endorsement.

78.     Neither woman was paid in full for the endorsement.

79.     Ms. Fry and Ms. Duffy both complained to management, who stated that Ms. Fry was "lucky to be getting anything" and to "stop making waves."

80.     Six weeks later, Ms. Fry and Ms. Duffy were terminated in retaliation for those Complaints, among others.

81.     Notably, Ms. Fry and Ms. Duffy were the only on-air individuals to be terminated and also happened to be the only two on-air individuals who had complained about pay disparity.

## Discriminatory Comments in the Workplace

82.     Ms. Fry requested a one-on-one conversation with Ms. Easton in January 2020 to complain about inappropriate statements made by the station manager Mr. Nathan Graham to Ms. Fry.

83.     During a morning show meeting with Mr. Tabler and their producer Ms. Laura Kuhen present, Mr. Graham asked Ms. Fry directly, "Do you plan on having children?" Ms. Fry responded, "That really isn't up for discussion." Mr. Graham continued, "You don't have to talk about it on-air if you don't want to. I'm just curious if you're going to have kids?" Ms. Fry responded, "Well, for me, it's actually really expensive to get pregnant." Mr. Graham laughed and replied, "So don't live in a mansion."

84.     The room went silent, and the meeting promptly ended.

85.     Ms. Easton took notes during this January 2020 meeting where Ms. Fry recounted the exchange with Mr. Graham.

86.     Ms. Easton unequivocally confirmed Mr. Graham's comments were inappropriate.

87.     Ms. Fry also complained to Ms. Easton that her manager, Mr. Graham, would not acknowledge her presence when Ms. Fry was in the room with Mr. Tabler and blatantly refused to copy Ms. Fry on emails concerning the Coop and Casey show.

### Ms. Fry's Termination

88.     During the January 2020 meeting between Ms. Fry and Ms. Easton, Ms. Fry also stated and brought her desire to take on more responsibility at Entercom in various ways and on additional formats.

89.     Ms. Easton agreed that this trajectory was not only possible but encouraged, considering Ms. Fry's extensive industry experience.

90.     She asked Ms. Fry what other opportunities she had in mind. Ms. Fry directly expressed her desire to be a part of the WBEB B101 air staff, if not then, in the future.

91.     Furthermore, Ms. Fry, being an avid consumer of hard news, told Ms. Easton she was also interested in Entercom's KYW News format.

92.     In fact, Ms. Fry had around this time sent an introductory email to Alex Silverman, Program Director of Entercom's KYW News Radio, that resided down the hall from TDY.

93.     Ms. Fry told Ms. Easton she heard a male employee, Michael Bennett, recently doing entertainment reports for KYW and that she was also interested in that format for news.

94.     Knowing Ms. Fry's local market comprehension, research, copy writing and delivery skills, in addition to her previous traffic reporting, Ms. Easton commended and encouraged Ms. Fry and offered to assist in any way when future opportunities arose.

95.     The meeting concluded positively, with clear comprehension by both parties that Ms. Fry not only had the desire, but the experience to continue being a valued member of Entercom's various brands, especially with the company being headquartered in her hometown of Philadelphia.

96.     Lastly, Ms. Fry was the only TDY talent originally from Philadelphia and had more on-air experience in the market than all full-time TDY talent combined.

97.     Indeed, Ms. Fry emailed Ms. Easton and Mr. David Yadgaroff, the Senior Vice President/Market Manager for Entercom, in late February 2020, anticipating the severity of the newly discovered COVID-19 virus, stating that in the event of "extenuating circumstances" she was willing and able to execute all of her duties remotely from her home studio with professional equipment.

98.     Ms. Fry was instead terminated on Friday, April 3, 2020.

99.     On this day Ms. Fry was suddenly unable to get onto her work email. She texted Ms. Easton who responded "Call me."

100.    On this early morning call, Ms. Fry was confronted without warning by Entercom's management, who advised that she was terminated immediately "due to Covid-19."

101.    Ms. Fry specifically inquired as to what would happen to the Coop and Casey show—to which David Yagaroff responded that they were not at liberty to discuss anyone else.

102.    Notably, Entercom never raised an issue with Plaintiff's performance of her employment and she had no negative performance reviews.

103.    Accordingly, its sole stated reason for termination was financial concerns, purportedly due to Covid-19, which are demonstrably pretextual as set forth below.

104.     Following the call Ms. Fry was asked to sign a termination agreement, which did not state a reason for termination.

105.     Ms. Fry indicated that she would not sign the agreement without a stated reason for termination.

106.     Entercom refused to provide a written reason for termination.[3]

107.     Accordingly, Ms. Fry never signed the separation agreement.

108.     Ms. Fry was not offered the opportunity to take a pay cut, to host an alternate format or take on any alternative roles.

109.     Instead, Ms. Fry was simply terminated.

### Pretextual Nature of Entercom's Stated Reasons for Termination

110.     Although Entercom claimed to terminate Ms. Fry for financial reasons, it did not suggest terminating Mr. Tabler, who made a significantly higher salary than Plaintiff.

111.     Indeed, Mr. Tabler was the single highest-compensated employee in all of TDY.

112.     Within days of Ms. Fry's termination, Mr. Tabler was put on another station (in Detroit) in addition to 96.5, which earned him additional salary.[4]

113.     On May 28th 2020, it was revealed that Mr. Bennett, a less experienced male host, was promoted as host of the WBEB B101 night show, the exact station Ms. Fry had inquired about with Ms. Easton in their January 2020 meeting.

114.     As set forth above, Ms. Duffy was a female and the only other on-air staff who was terminated (after she complained about unequal pay with Ms. Fry).

---

[3]     Notably, several weeks after the expiration of the time window in which Ms. Fry was to sign the original proposed separation agreement, Entercom sent an unprompted "revised" separation agreement attributing Ms. Fry's termination to Covid-19. Compare **Exhibit "D,"** the original separation agreement, to **Exhibit "E."**
[4] Notably, TDY never changed the name of the show to the "The Coop Show."

115.    Moreover, a novice WBEB B101 Producer, Mr. Nathan Weaver, was promoted to a weekend show on both WBEB B101 and WTDY 96.5 just weeks after Ms. Fry's termination.

116.    Meanwhile, Mr. Tabler was promoted throughout the Spring and Summer on various Entercom stations and formats.

117.    These additional promotions included pay raises.

118.    In addition, in the days following after Ms. Fry's termination, Entercom posted positions including Part-Time Air Talent for Philadelphia Music Stations, KYW Part-Time Anchor/Reporter, KYW Part-Time Traffic Center Reporter/Editor, WPHT Part-Time Board Operator and Content Producer for their RADIO.COM department. See April 3, 2020 screenshots attached hereto as **Exhibit "C."**

119.    These were all opportunities Ms. Fry was more than qualified to assume.

### Favorable Treatment of Male Employees

*i.*     *Nathan Graham Promoted Despite Lack of Experience*

120.    Mr. Nathan Graham was not Ms. Fry's direct supervisor until approximately three months after she was hired by Entercom.

121.    When Ms. Easton disclosed to Mr. Tabler and Ms. Fry that Mr. Graham would be entering as their Program Director, she indicated that he was young.

122.    In fact, he was about ten years Ms. Fry's junior.

123.    Both Mr. Tabler and Ms. Fry expressed their concern about this news since they both had almost 30 years of combined experience between them and in larger markets.

124.    Ms. Easton admitted this was Mr. Graham's first true Program Director role; the one Entercom had previously placed him in, in Detroit, was a short-lived 90 days.

125.     She divulged the company felt bad they had relocated him only to transition the station to another format and therefore relocated him to TDY in Philadelphia.

126.     Ms. Easton said she would be guiding and working closely with Mr. Graham and that Mr. Tabler and Ms. Fry could continue to directly report to her until Mr. Graham had a grasp on his new role and managing staff.

127.     Ms. Easton admitted that collectively, Mr. Tabler and Ms. Fry were more experienced in the programming of the "Coop and Casey" morning show and that together, they would make major and final decisions regarding their show, which they also continued to do for the entirety of their time together.

128.     This clearly indicates that not only does Entercom have a preference for protecting their male employees, but they were complicit in hiring a less than experienced male for a Program Director role in a major market.

129.     Mr. Graham had a decade less of experience in general in the entire radio industry, yet was tasked with managing a morning show having never hosted one himself. Despite all of these facts, he was placed as Mr. Tabler and Ms. Fry's direct supervisor.

130.     Furthermore, since Ms. Easton knew this could hinder the success of "Coop and Casey", she told both Mr. Tabler and Ms. Fry that they could continue to report to her instead of Mr. Graham, with the exception of a weekly show meeting with Mr. Graham, which did not commence until many weeks after his installation.

131.     Notably, Mr. Graham was not terminated as part of the alleged "Covid-19" layoffs.

ii.     *Mr. Tabler Promoted Despite Previous Sexual Misconduct at Entercom*

132.    Mr. Tabler was in fact terminated from Entercom several years prior to the Coop and Casey Show following a lewd act in which he engaged in fornication with a station intern.

133.    Mr. Tabler told Ms. Fry that Entercom explicitly told him he was "un-hirable again."

134.    Upon their negotiations with Entercom for positions at TDY, Mr. Tabler divulged to Ms. Fry that he was going through some "HR hang-ups" because of his previous termination and its reasoning.

135.    Entercom overlooked this matter and moved forward with hiring Mr. Tabler on the Coop and Casey Show, and yet still chose to terminate Ms. Fry despite Mr. Tabler's past conduct.

### iii.    *Males Offered Continued Employment Opportunities Following Ms. Fry's Termination*

136.    At or around the same time as Ms. Fry's termination, Entercom employees were asked to take a 10-15% pay cut depending on their salary.

137.    Mr. Tabler refused to do so as his contract prevented Entercom from adjusting his compensation.

138.    Ms. Fry was never given the option to take a 10-15% pay cut, or any cut for that matter.

139.    She was also never given the opportunity to pick up additional work in Philadelphia or other Entercom markets or formats.

140.    Just days after Ms. Fry's termination, Entercom asked Mr. Tabler to "voice-track" additional shifts on TDY.

141.    Voice-tracking is the pre-recording of a show to be aired at a later date or time and/or in a separate market. This can be done in-studio or remotely with basic equipment.

142.    Entercom knew that both Mr. Tabler and Ms. Fry had this equipment at home.

143.    Instead, Mr. Tabler negotiated more money for these additional shifts.

144.    Just eight weeks after Ms. Fry's termination, TDY Afternoon Host Michael Bennett was given a promotion to Entercom's WBEB B101 Adult Contemporary station—a format for which Ms. Fry was more than qualified and had previously expressed interest.

145.    Like Mr. Tabler, Mr. Bennett holds no higher education degree.

146.    Ms. Fry was more qualified than Mr. Bennett for this position because she was a host on New York City's 95.5 PLJ, where she solo hosted the adult contemporary format from Madison Square Garden at one of the most prestigious adult contemporary stations in the country.

147.    Mr. Bennett did not have comparable experience in this format or in a comparable market.

148.    In addition, Ms. Fry had significantly more years of experience in this market.

149.    Mr. Bennett did not start in the Philadelphia region until 2014, compared to Ms. Fry who has been on-air in this market since 2005.

150.    TDY is a single station in the Entercom network and operates as its own encapsulated team.

151.    Notably, Ms. Fry was the only TDY employee to be terminated, leaving the weekday on-air programming exclusively staffed by male employees.

**DAMAGES**

18

152.    Ms. Fry claims back pay for the years in which Mr. Tabler was paid more than she for work requiring substantially the same level of skill, effort and responsibility in the same or similar working conditions.

153.    Due to Defendant's continued unequal pay and harassing/discriminatory treatment, Ms. Fry suffered severe emotional distress and resultant physical manifestations of the same.

154.    She began to feel unwell, stressed, worried, and anxious constantly.

155.    Further, as a result of the Defendant's discriminatory and retaliatory conduct, Plaintiff suffered severe humiliation and anguish.

156.    Ms. Fry's sudden and abrupt departure from her morning show—and her radio presence—led to significant reputational damage and her inability to find comparable employment.

157.    Ms. Fry claims front pay due to the reputational damage she has suffered as a result of Defendants' unlawful conduct, leading to an inability to find comparable work.

## COUNT I
## VIOLATION OF TITLE VII: DISCRIMINATION

158.    Ms. Fry incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

159.    Defendant discriminated against Ms. Fry with respect to her compensation, terms, conditions, and/or privileges of employment because of her sex.

160.    Defendant also discriminated against Ms. Fry by improperly limiting, segregating and/or classifying her in a manner that deprived her of employment opportunities and/or otherwise adversely affected her status as an employee because of her sex.

161.    By discriminating against Ms. Fry based on her sex, Defendant violated Title VII.

## COUNT II
## VIOLATION OF TITLE VII: RETALIATION

162.     Ms. Fry incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

163.     But for Ms. Fry's complaint to Defendant about her unfair and unequal compensation, she would not have been terminated from employment with Defendant.

164.     By retaliating against Ms. Fry for her complaints about discrimination, Defendant violated Title VII.

## COUNT III
## VIOLATION OF EQUAL PAY ACT OF 1963: DISCRIMINATION

165.     Ms. Fry incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

166.     Defendant discriminated against Ms. Fry by paying her a wage at a rate less than the rate at which the Defendant pays wages to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.

167.     The Defendant's conduct is a malicious and/or reckless act of discrimination.

168.     By discriminating against Ms. Fry based on her sex, Defendant violated the Equal Pay Act of 1963.

## COUNT IV
## VIOLATION OF EQUAL PAY ACT OF 1963: RETALIATION

169.     Ms. Fry incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

170.     But for Plaintiff's complaint to Defendant about her unfair and unequal compensation, Plaintiff would not have been terminated from her employment with Defendant.

171.    By retaliating against Ms. Fry for her complaints about the continued discrimination, Defendant violated the Equal Pay Act of 1963.

## COUNT V
## GENDER DISCRIMINATION (PENNSYLVANIA HUMAN RELATIONS ACT)

172.    Ms. Fry incorporates the preceding paragraphs of this Complaint as if fully set forth herein. Plaintiff is in a protected class on the basis of her female gender.

173.    Plaintiff suffered an adverse employment action on the basis of her gender.

174.    By discriminating against Plaintiff based on her gender, and discharging Plaintiff based on her gender, Defendant violated § 955(a) of the Pennsylvania Human Relations Act 43 P.S. 951-963.

## DEMAND FOR JURY TRIAL

175.    Ms. Fry demands a jury trial on all counts of this Complaint.

**Wherefore**, Plaintiff prays for the following relief:

a.      Order Defendant to reinstate her to the position she would have had if she had not been unlawfully discriminated against, together will all compensation, benefits, and job opportunities incident thereto;

b.      Order Defendant to compensate Plaintiff for the full value of compensation and benefits she would have received had she not been the victim of sex discrimination, with interest thereon;

c.      Enter a judgment in favor of Plaintiff and against Defendant in the amount of Plaintiff's unpaid wages, including overtime compensation, and liquidated damages in an additional amount equal to front and back pay;

      d.      Enter a judgment in favor of Plaintiff and against Defendant for compensatory and punitive damages under Title VII;

      e.      Enter a judgment in favor of Plaintiff and against Defendant under the Equal Pay Act of 1963 in the amount of Plaintiff's unpaid wages, including overtime compensation, and liquidated damages in an additional amount equal to front and back pay;

      f.      Enter a permanent injunction enjoining Defendant from discriminating or retaliating against Plaintiff in any manner that violates the Title VII or the Equal Pay Act of 1963;

      g.      Order Defendant to pay Plaintiff the costs of this litigation, including reasonable attorneys' fees; and

      h.      Grant Plaintiff such further legal and equitable relief as the Court may deem just and proper.

**BOCHETTO & LENTZ, P.C.**

Date: October 25, 2021          BY: _____

                              Bryan Lentz, Esq.
                              Bochetto & Lentz, P.C.
                              1524 Locust Street
                              Philadelphia, PA 19102
                              (215) 735-3900
                              blentz@bochettoandlentz.com
                              Attorneys for Plaintiff